Order Entered.

Patrick M. Flatley
United States Bankruptcy Judge
Dated: Friday, April 17, 2009 4:04:05 PM

# THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BELINDA LEE HUGHES | ) | |
| | ) | Case No. 08-1125 |
| Debtor. | ) | |
| | ) | |
| ERIC J. WEBER | ) | |
| | ) | Case No. 08-1228 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| THE BUSINESS BACKER, LLC | ) | Adv. Proc. No. 08-78, *administratively* |
| | ) | *consolidated with* |
| Plaintiff, | ) | Adv. Proc. No. 08-77 |
| | ) | |
| v. | ) | |
| | ) | |
| ERIC J. WEBER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

In May 2008, The Business Backer ("TBB") purchased $31,550 in future credit card receivables from Belinda & Eric's LLC ("B&E") for $25,240. Belinda Hughes and Eric Weber (collectively the "Debtors") are the owners/managers of B&E, and they guaranteed B&E's performance under the purchase of receivables agreement. Within a month, B&E ceased to conduct business. TBB now seeks summary judgment on its complaint to except $21,716.82 – representing the amount of uncollected future receivables – from the Debtors' discharge under 11 U.S.C. §§ 523(a)(2) and 523(a)(4). The Debtors also seek summary judgment on the grounds that the uncontested facts do not support TBB's causes of action.

For the reasons stated herein, the court will deny TBB's motion for summary judgment and

will grant the Debtors' motion for summary judgment in both of these consolidated adversary proceedings.

## I. STANDARD OF REVIEW

Summary judgment is appropriate when the matters presented to the court "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment has the initial burden of proving that there is no genuine issue as to any material fact. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 161 (1970). Once the moving party has met this initial burden of proof, the non-moving party must set forth specific facts sufficient to raise a genuine issue for trial and may not rest on its pleadings or mere assertions of disputed facts to defeat the motion. *Matsushita Electric Industrial Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (stating that the party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts"). The mere existence of a scintilla of evidence in support of the opposing party's position will not be sufficient to forestall summary judgment, but "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In ruling on a motion for summary judgment, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. A fact is not "genuinely disputed" unless the factual conflict between the parties requires a trial of the case for resolution. *Finley v. Giacobbe*, 79 F.3d 1285, 1291 (2d Cir. 1996) ("If there is any evidence in the record from which a jury could draw a reasonable inference in favor of the non-moving party on a material fact, this Court will find summary judgment is improper.").

## II. BACKGROUND

Belinda Hughes is the sole owner of B&E. Eric Weber is a manager. In October 2003, B&E executed a 5-year lease with an entity owned by Gino Marchese. B&E used the premises to operate a business, The Corner Grocery. Although the Debtors did not have a good relationship with Mr. Marchese, in the late winter and early spring of 2008, they expected that they would be able to sell The Corner Grocery as a going concern, or at least be able to operate out of the real property until September 31st of that year. The Corner Grocery did most of its business in the summertime, with the winter being the slower season. In the winter of 2007-08, The Corner Grocery was low on cash.

-2-

In addition to The Corner Grocery, B&E also operated another business, Good Times Diner & Market. In 2007, the Diner had a brisk summertime lunch business that served local construction crews. Like The Corner Grocery, however, in the winter of 2007-08 Good Times Diner & Market was running out of cash.

To meet B&E's cash needs at its business locations, the Debtors contacted TBB for the purpose of selling B&E's future credit card receivables in exchange for an immediate cash payment. In March 2008, B&E executed two agreements. The Corner Grocery sold $7,910 in future credit card receivables for $6,000. Good Times Diner & Market sold $24,320 in future credit card receivables for $16,000. TBB was to receive the value of its purchases by retaining between 33% and 40% of each future credit card transaction. As part of the purchase agreement, TBB filed a financing statement in an effort to obtain a security interest in substantially all the property of B&E. In the purchase agreements, the Debtors, on behalf of B&E, made certain representations, including: (a) B&E was duly organized, validly existing and in good standing under the laws of West Virginia and its local jurisdiction;[1] (b) B&E had full power and authority to enter into the purchase agreement; (c) all information provided to TBB in connection with the purchase agreements was true, accurate and complete in all respects; (d) B&E would conduct business in the ordinary course, consistent with past practice, and would not cease operations; and (e) B&E would not sell, dispose of, convey or otherwise transfer its business or assets without the prior written consent of TBB.

When B&E requested that TBB purchase its future receivables in March 2008, the Debtors knew that the initial 5-year term of B&E's lease with Mr. Marchese would be ending on September 31, 2008. TBB also knew this, inasmuch as its representative called Mr. Marchese and was informed that he would not extend B&E's lease. Also, at the time B&E executed the March 2008 purchase agreement, it had been actively seeking a purchaser for The Corner Grocery. Although B&E received several inquiries, the potential sales eroded after the prospective purchasers spoke with Mr. Marchese about extending the lease, or obtaining a new one. One of the prospective purchasers, Ron Funkhouser, decided not to purchase The Corner Grocery after speaking with Mr.

---

[1] At the time B&E obtained financing from TBB, B&E had failed to file an annual report with the West Virginia Secretary of State and its status as a business entity was revoked. In January 2009, B&E paid its missing annual fee, and was reinstated as a West Virginia business entity.

−3−

Marchese because Mr. Marchese informed him that he would be better off waiting until B&E's lease terminated, at which time Mr. Marchese would lease the premises to him. In the event that the Debtors could effect a sale, then they anticipated that B&E would pay TBB in full.

Meanwhile, due to conditions that the Debtors attribute to the worsening regional economy, neither The Corner Grocery nor Good Times Diner & Market was experiencing the expected increase in seasonal business. The downturn in business, combined with the continuing loss of a prospective sale of The Corner Grocery, convinced the Debtors to have B&E close The Corner Grocery on April 22, 2008:

> Once we learned that Mr. Funkhouser had made a deal or that Gino Marchese had made a deal with Mr. Funkhouser which basically removed him from being a buyer of The Corner Grocery, and we confronted Gino Marchese about it and he admitted it, we knew at that point–well, at that point, we had just had it with Mr. Marchese and knew that business was–it just didn't warrant continuing business there.

(Eric Weber Depo. p. 61).

On April 30, 2008, B&E sold much of the personal property in The Corner Grocery to Mr. Funkhouser for $5,000 – without informing TBB. The Debtors did, however, contact TBB with regard to the closing of The Corner Grocery and they requested that the receivables remaining to be collected from The Corner Grocery be combined with the receivables to be collected from Good Times Diner & Market.

TBB agreed to consolidate the purchase of receivables, and in May 2008, the parties executed another purchase of receivables agreement whereby TBB purchased $31,550 in future receivables from Good Times Diner & Market for $25,240. In actuality, B&E only received about $2,500 in new money, and the remainder of the purchase reflected the consolidation of the two earlier agreements. The Debtors' hope was that Good Times Diner & Market would generate sufficient business to repay TBB:

> Our intention and our hope was that we were going to push really since we didn't have to worry about The Corner Grocery anymore and didn't have that overhead hanging over us and the running of that business hanging over us, that we can concentrate on Good Times and hopefully really push Good Times and make Good Times work and be able to pay off The Business Backers. That was our intention.

(Eric Weber Depo. p. 71).

–4–

By June 2008, however, it became clear to the Debtors that Good Times Diner & Market was having decreasing sales, it lacked adequate funds to operate, and it was behind on its rent. Consequently, in early July 2008, Good Times Diner & Market closed its doors and sold off its remaining inventory and fixtures for $5,100. Only after Good Times Diner & Market had closed, and after B&E had sold off the remainder of the property in the store, did the Debtors contact TBB to inform it that neither B&E nor themselves would be able to perform under the purchase agreement. When Good Times Diner & Market closed, TBB was still owed $21,716.82 in future receivables.

## III. DISCUSSION

TBB argues that the Debtors owe it $21,716.82 based on their guarantee of B&E's performance on the receivables purchase agreement, and that this debt is excepted from the Debtors' bankruptcy discharges pursuant to 11 U.S.C. §§ 523(a)(2) and 523(a)(4). In the alternative, TBB asserts that $10,100 should be excepted from the Debtors' discharges, representing the proceeds from the unauthorized sale of B&E's property and TBB's secured collateral. The Debtors do not dispute owing money to TBB,[2] but they dispute that the debt is one excepted from their Chapter 7 bankruptcy discharges.

### A.    Section 523(a)(2)

In seeking relief under § 523(a)(2), TBB argues that the following uncontested facts entitle it to relief: (1) the Debtors caused B&E to fail to meet is reporting requirements with the West Virginia Secretary of State and, at the time TBB purchased B&E's future receivables, B&E was not

---

[2] The Debtors executed the agreements with TBB as "guarantors" of B&E's performance. The terms of the May 2008 Guaranty Agreement state that, should B&E fail to timely make payments to TBB on a timely basis, then "all amounts then due to TBB and unpaid under this Agreement shall become due and collectible from each of the undersigned [guarantors] immediately." Based on this language, the Debtors were acting as sureties of B&E's performance – they were insuring payment and not B&E's solvency. As such, no requirement exists that TBB first obtain judgment against B&E before proceeding against the Debtors individually. *E.g.*, 18 Michie's Jurisprudence of Virginia and West Virginia, *Suretyship* § 30 (2008) ("The creditor may proceed at law against the principal and the sureties in the first instance and obtain a judgment and execution against them jointly, the general rule being that the creditor is under no obligation to look to the principal debtor or to his property or to exhaust his remedies against the latter before resorting to the surety.").

–5–

a recognized corporation in good standing with the Secretary of State; (2) the Debtors did not review the purchase of receivables agreements so as to be familiar with their terms; and (3) the Debtors failed to notify TBB that the assets of B&E's businesses were being liquidated and the Debtors kept the proceeds for themselves.

Section 523(a)(2)(A) excepts from discharge any debt "for money . . . to the extent obtained, by-- (A) false pretenses, a false representation, or actual fraud . . . ." In a similar manner, § 523(a)(2)(B) excepts from discharge debts for money obtained by the "use of a statement in writing – (i) that is materially false . . . . and (iv) that the debtor caused to be made or published with intent to deceive . . . ." These exceptions to discharge are to be narrowly construed in favor of the debtor. *E.g.*, *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997) (explaining that the rule of narrow construction is based on the "fresh start objectives of bankruptcy").

Not all debts incurred as a result of fraud fall within the § 523(a)(2) exception to discharge; rather, this exception only includes those "debts in which the debtor used fraudulent means to obtain money . . . ." *Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215, 219 (4th Cir. 2007). The intent of § 523(a)(2) is "to protect creditors who were tricked by debtors into loaning them money or giving them property, services, or credit through fraudulent means." *Id.* at 219-20. Regarding a debtor's misstatement of intention, it is only "fraudulent if he does not have that intention at the time he makes the representation." *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997) (quoting *Restatement (Second) of Torts* § 530(1) (1976)); *see also Lindau v. Nelson (In re Nelson)*, 357 B.R. 508, 513 (B.A.P. 8th Cir. 2006) ("Even if a false statement is made, no fraud exists unless the maker knows the statement is false at the time the statement is made. . . . To amount to fraud, a statement must be made deliberately and intentionally with the intention and purpose of deceiving."). A fraudulent misrepresentation may also be made when a debtor makes a statement with reckless disregard as to whether the statement is true or false. *Boyuka v. White (In re White)*, 128 Fed. Appx. 994, 998; 2005 U.S. App. LEXIS 7374 at *9-10 (4th Cir. April 28, 2005).

Regarding the Debtors' representation in the purchase agreements that B&E was in compliance with all applicable laws, and was a validly existing business entity in good standing under the laws of West Virginia, the record does not reflect that the Debtors knew these statements

−6−

to be false at the time they were made, or that the Debtors made the statements with reckless disregard for the truth. B&E maintained all of its business licenses, with the exception that it failed to file an annual report in 2007, which led to revocation of B&E's status as an LLC in September 2007. As stated in the Debtors' depositions, however, they believed that B&E was a validly existing LLC in good standing, and they were unaware that B&E's status as an LLC had been revoked when they executed their agreements with TBB.[3] Consequently, the Debtors' representation that B&E was a validly existing business in good standing was not reckless, or knowingly false, when the Debtors executed the purchase of receivables agreements with TBB.

TBB also complains that the Debtors failed to fully read the terms of the receivables purchase agreements and understand their basic terms. For example, Eric Weber stated in his deposition that he was unaware that TBB had filed a financing statement to perfect a secured interest in the personal property of B&E. It does not appear, however, that TBB undertook any effort to educate the Debtors that they were signing a security agreement giving TBB rights to the personal property of B&E. When TBB called the Debtors to go over the basic terms of the agreements with

---

[3] Eric Weber explained how B&E's status as a West Virginia LLC was revoked:

> Basically, what happened was we never got a renewal from the State Tax Department and because we were both working managers of the corporation and worked every single day, we relied upon notices to keep everything current and in the past anytime we didn't get a notice, it had some effect on some operation of our business and we were made aware of that which reminded us that we had to renew the license or whatever the license was.
> In every other case, over the course of years we were in business, we had renewed every license that we needed to stay in business, in order to keep the operation going. So, because we were not sent a renewal notice, we were not aware that the LLC had been revoked. We never got notice that the LLC had been revoked after it had been revoked.
>  . . . .
> Normally the form that they send in the past was a status of the LLC and requesting if any information had changed. If the information had changed, you were supposed to indicate that on the renewal form, if not, just indicate not, enclose the $30 fee and send it in. That was it.

(Eric Weber Depo. p. 25-26).

–7–

them, TBB never mentioned that the purchase agreements also granted TBB a security interest in B&E's personal property.  In any event, the Debtors' failure to understand that TBB was retaining a security interest in B&E's property at the time they executed the purchase agreements is not the type of fraudulent misrepresentation or statement in writing that is intended to deceive TBB into transferring money to the Debtors.  TBB obtained the security agreement.  No indication exists in the record that the Debtors made a false or reckless promise to provide TBB with a security agreement for B&E's personal property for the purpose of inducing TBB to extend value.  TBB received exactly what was promised.

Finally, TBB complains that the Debtors failed to notify it that the assets of B&E's businesses were being liquidated, and then failed to remit the sale proceeds to it.  Under the terms of the purchase agreement, B&E was neither allowed to cease its operations, nor to sell its business without the consent of TBB.  No indication exists, however, that these covenants were falsely made, or recklessly made, by the Debtors at the time they executed the purchase agreements.  Although the Debtors were actively seeking to sell The Corner Grocery at the time the agreements were executed, that sale never materialized, and seeking prospective purchasers was not a prohibited act under the terms of the agreements.  Moreover, the Debtors anticipated that TBB would be fully repaid in the event that the Debtors' sale efforts were successful.  The fact that the Debtors may have later caused B&E to sell its collateralized assets without paying the proceeds to TBB does not render the covenants in the purchase of receivables agreements false when made.  Also, while, in hindsight, the Debtors' hope and anticipation that Good Times Diner & Market would be able to perform under the receivables purchase agreement was unfounded, no showing has been made that the Debtors' business optimism was so unfounded as to amount to a false representation of B&E's ability to perform, or a reckless statement as to B&E's ability.

In sum, TBB has failed to demonstrate that any of the covenants made by the Debtors in the purchase agreements were reckless, or knowingly false, when made, and, therefore, TBB is not entitled to summary judgment on its § 523(a)(2) causes of action.

**B.    Section 523(a)(4)**

TBB asserts that the Debtors owed it a fiduciary obligation on the grounds that they engaged in acts that were not appropriate to the winding up of B&E's business activity.  This fiduciary duty,

−8−

TBB argues, is imposed by W. Va. Code § 31B-8-804(b), which governs an LLC member's or manager's power and liability to act as an agent for the LLC after its dissolution:

> (b) A member or manager who, with knowledge of the dissolution, subjects a limited liability company to liability by an act that is not appropriate for winding up the company's business is liable to the company for any damage caused to the company arising from the liability.

*Id.*

Section 523(a)(4) excepts debts from discharge that arise out of "fraud or defalcation while acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4). An essential element of a § 523(a)(4) cause of action is that the debtor be acting in fiduciary capacity. The definition of "fiduciary" for purposes of § 523(a)(4) is controlled by federal common law. *Harrell v. Merchant's Express Money Order Co. (In re Harrell)*, No. 98-1728, 1999 U.S. App. LEXIS 4743 at *7 (4th Cir. March 19, 1999) (citing *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998)). Under the federal common law, the term "fiduciary" is limited to instances involving express or technical trusts. *Id.* In an express or technical trust, "[t]he trustee's obligations must have been imposed prior to, rather than by virtue of, any claimed misappropriation of funds . . . ." *Id.* at *8. Like all exceptions to a debtor's discharge, § 523(a)(4) is narrowly construed in favor of the debtor. *Kaspar*, 125 F.3d at 1361.

Here, TBB has failed to demonstrate the existence of an express or technical trust – no words of trust are contained in the purchase agreements. *Cf.*, *Kubota Tractor Corp. v. Strack (In re Strack)*, 524 F.3d 493 (4th Cir. 2008) (finding that the debtor and creditor established an express trust based on the specific language in their financing agreement); *Airlines Reporting Corp. v. Ellison*, 296 F.3d 266, 269-70 (4th Cir. 2002) (finding that the creditor and debtor corporation created an express trust with regard to bank account funds, and that the debts owed by the corporate guarantors with respect to that express trust were excepted from discharge under § 523(a)(4)). Moreover, the source of the Debtors' alleged fiduciary duty to TBB is W. Va. Code § 31B-8-804(b), which is only made applicable when some event causes the dissolution or the winding up of an LLC's business. *See* 31B-8-801(b) (specifying the events causing dissolution and winding up of an LLC). TBB has not made any showing that B&E was in the process of dissolving or winding up its business so as to

make the statute applicable. Indeed, as of January 2009, B&E was still a licensed LLC in the State of West Virginia, and although it liquidated two of its business operations, the LLC has not been dissolved. B&E is still poised to continue business operations in the future.

Consequently, the court will deny TBB's motion for summary judgment on its 11 U.S.C. § 523(a)(4) cause of action both because TBB has not demonstrated the existence of an express or technical trust, and because TBB has failed to demonstrate that the Debtors were acting in a fiduciary capacity to it.

## IV. CONCLUSION

TBB filed a three-count complaint against the Debtors alleging causes of action under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B) and 523(a)(4). TBB has failed to establish an essential element of each of its stated causes of action on summary judgment, and, therefore, its summary judgment motion will be denied. The Debtors also filed a motion for summary judgment arguing that they never made a fraudulent misrepresentation to TBB when they executed the purchase of receivables agreements under § 523(a)(2), and that they were not fiduciaries to TBB or in a trust relationship with it. Construing the evidence in a light most favorable to TBB as the non-movant on the Debtors' summary judgment motion, the court can deduce no genuine issue of material fact showing that the Debtors made a fraudulent misrepresentation under § 523(a)(2), or acted in a fiduciary capacity with respect to a trust within the meaning of § 523(a)(4), and, therefore, the court will grant the Debtors motion for summary judgment on all counts of the Complaint.

A separate order will be entered pursuant to Fed. R. Bankr. P. 9021.